# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

### No. ACM 40439

———————————

### UNITED STATES
*Appellee*

**v.**

### William C.S. HENNESSY
Airman First Class (E-3), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 20 August 2024

———————————

*Military Judge*: Sterling C. Pendleton.

*Sentence*: Sentence adjudged 9 February 2022 by GCM convened at Spangdahlem Air Base, Germany. Sentence entered by military judge on 4 March 2022: Dishonorable discharge, confinement for 34 months, reduction to the grade of E-1, and a reprimand.

*For Appellant*: Major Heather M. Bruha, USAF[1]; Philip D. Cave, Esquire.

*For Appellee*: Colonel Zachary T. Eytalis, USAF; Lieutenant Colonel J. Peter Ferrell, USAF; Major Jocelyn Q. Wright, USAF; Major Lecia E. Wright, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, MASON, and WARREN, *Appellate Military Judges*.

Judge MASON delivered the opinion of the court, in which Chief Judge JOHNSON and Judge WARREN joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

[1] Major Bruha is also identified in Appellant's record of trial as Major Heather M. Caine USAF, before changing her name.

———————————

MASON, Judge:

A general court-martial composed of officer and enlisted members convicted Appellant, contrary to his pleas, of one specification of sexual assault and two specifications of abusive sexual contact, in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920.[2] The military judge sentenced Appellant to a dishonorable discharge, confinement for 34 months, reduction to the grade of E-1, and a reprimand. Appellant requested that the convening authority defer the adjudged reduction in rank until action as well as the automatic forfeitures until entry of judgment. The convening authority denied Appellant's deferment requests, took no action on the findings, and approved the sentence in its entirety.

Appellant raises six issues on appeal, which we have re-ordered and consolidated: (1) whether the military judge abused his discretion in denying a challenge for cause to SG, a prospective panel member, for implied bias;[3] (2) whether Appellant's Due Process rights were violated because he was convicted of a theory of criminality not on the charge sheet; (3) whether the conviction for sexual assault is legally and factually insufficient; (4) whether trial counsel's findings argument was improper; (5) whether Appellant was denied his right to a unanimous verdict; and (6) whether the post-trial processing delay should result in dismissal.

We have carefully considered issues (2) and (5) above and find they do not require discussion or relief. *See United States v. Matias,* 25 M.J. 356, 361 (C.M.A. 1987).[4]

For the reasons set forth below, we find that the excessive post-trial processing delay warrants relief. As to the remaining issues, we find no additional

---

[2] Unless otherwise noted, all references in this opinion to the UCMJ and Rules for Courts-Martial are to the *Manual for Courts-Martial, United States* (2019 ed.).

[3] Appellant raises issue (1) and part of issue (4) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[4] Regarding issue (2), *see, e.g., United States v. Horne*, No. ACM 39717, 2021 CCA LEXIS 261 (A.F. Ct. Crim. App. 27 May 2021) (unpub. op.); *United States v. Williams*, No. ACM 39746, 2021 CCA LEXIS 109 (A.F. Ct. Crim. App. 12 Mar. 2021) (unpub. op.), *aff'd on other grounds*, 81 M.J. 450 (C.A.A.F. 2021); *United States v. Harris*, No. ACM 39640, 2020 CCA LEXIS 299 (A.F. Ct. Crim. App. 2 Sep. 2020) (unpub. op.); *United States v. Lull*, No. ACM 39555, 2020 CCA LEXIS 301 (A.F. Ct. Crim. App. 2 Sep. 2020) (unpub. op.). Regarding issue (5), *see United States v. Anderson*, 83 M.J. 291, 302 (C.A.A.F. 2023), *cert. denied*, 144 S. Ct. 1003 (2024).

error that materially prejudiced Appellant's substantial rights. We affirm the findings and the sentence, as modified, in our decretal paragraph.

## I. BACKGROUND

In March 2018, Appellant was stationed at Spangdahlem Air Base (AB), Germany. Around that time, Appellant met an Airman in the dorm, KG. They saw each other in passing a few times and became friends. They exchanged messages on social media. At some point, Appellant and KG decided to hang out in KG's room. The plan was to watch videos and funny Internet pictures. When Appellant arrived at KG's room, he immediately laid down on her bed. KG sat down next to him and they started watching videos. Appellant leaned in and inched closer to her. KG leaned away. Appellant touched KG's buttocks and his hand came to a rest on her thigh. KG paused the video and stood up, telling Appellant that their "time in the room was done" or words to that effect and Appellant left.

In March 2019, KE arrived on station at Spangdahlem AB. A few months after her arrival, KE received a direct message from Appellant telling her that they had "matched" on a dating website. KE responded to the message and the two continued to exchange messages on multiple social media platforms over the next few days. About a week after their initial online interaction, they made plans to meet in person. Appellant invited KE to his dorm room and KE agreed to meet him there.

Around 1500 to 1600 on 8 June 2019, KE went to Appellant's dorm room. They both sat on Appellant's couch and watched a show. Appellant inched closer to KE. Appellant reached to hold KE's hand. KE felt like Appellant was moving too quickly as they had just met. When Appellant leaned in as if to kiss her, KE pulled away. A few minutes later, Appellant again leaned in as if to kiss her. This time, he used one hand to grab her face and kissed her on the lips. KE again pulled away. Appellant said, "I'm sorry. I know I'm super affectionate." After the kiss, KE stayed in Appellant's dorm room for a little under a half hour and then left.

When KE was back in her room, Appellant sent her a message that said, "Hey, I'm sorry if I was moving too fast. I'd like it if we could start over and meet up later tonight for the concert." Feeling better after Appellant's apology, KE went to a concert at the club on base that night with Appellant. They had talked about the concert earlier because KE wanted to go and her friends were not available. KE arrived at the concert and saw Appellant sitting with his friends. She approached them, sat down and watched the concert. Towards the end of the evening, while they were still at the club, Appellant asked KE, "So my room or yours?" KE responded, "You go to yours and I'll go to mine." Appellant stated, "Okay."

During the evening, and still at the club, KE received a call from her brother. While KE was on the call, Appellant approached her and started rubbing her back. KE nudged it off, Appellant stopped, and KE continued her conversation.

At the end of the evening, KE was feeling "drunk or buzzed." She described her experience with alcohol prior to arriving on station as "none." That night, KE drank multiple alcoholic drinks. Appellant offered to give KE a "piggyback ride." KE, tired and drunk, agreed. The next thing KE remembered after getting on Appellant's back is waking up in Appellant's room with Appellant having sex with her. KE opened her eyes and saw Appellant's penis inside of her. KE did not know how they got to that point, but decided to pretend that she was asleep to get Appellant to stop. She closed her eyes and turned her head. Appellant called her name and said, "Oh, no." He shook her shoulder to get her to wake up or open her eyes. Appellant then stopped penetrating KE, got up and walked away. After Appellant stepped out, KE got up and started gathering her things. She told Appellant that she needed to go and that her friend needed her. Appellant responded by asking KE to stay. He offered KE the option of staying on the bed and he would sleep on the couch. KE declined saying that her friend really needed her. When she was dressed and had her things, KE left. She proceeded down to the ground level of the dorm building and ran to her dorm room.

Upon arrival at her room, KE cried and unsuccessfully tried to reach out to one of her friends, SL. However, she was able to reach another friend, KB. She met KB outside the dorm building and told him what had happened to her. Not long after meeting with KB, KE was able to contact SL. Within about 15 minutes of the phone call, SL met KE outside the dorm room. The two of them proceeded up to KE's room. KE was crying and wanted a female to help her.

That night, KE reported to the Sexual Assault Response Coordinator what had happened. They told KE about the possibility of completing a "sexual assault kit." KE agreed to have a forensic medical examination. During this examination, DNA samples were collected. DNA collected from KE's cervical swab came from Appellant.

On 4 July 2019, IE, a German national, was living in a town near Spangdahlem AB. IE and her friends were planning on coming to the base to watch the fireworks. IE had previously met Appellant. They met in late 2018 or early 2019 at a club and had seen each other at a bar on another occasion. On the night they met, they "made out." On the second occasion, they had "a short kiss." Between their meeting and 4 July 2019, they had exchanged a few messages and IE would occasionally see Appellant from afar when she was out with her friends at an Irish pub. Occasionally, Appellant would invite IE to come hang out on base. IE declined those offers because she did not want to go

into his dorm and generally preferred to meet people in public places. Every time she offered to meet in town, Appellant declined those invitations.

At the time, IE's friend was dating an Airman at Spangdahlem AB, and IE agreed to go with them to a Fourth of July celebration on base. IE and her friend arrived on base around 1800 or 1900 on 4 July 2019. While there, IE saw Appellant and talked with him. At one point in the evening, Appellant and IE walked to Appellant's dorm building because Appellant stated that he needed to get something from his room. Once they arrived, Appellant repeatedly asked IE if she wanted to come into his dorm room. IE responded in the negative and waited outside the room. Appellant came out of his room and the two of them went their separate ways—IE returned to her friends and Appellant walked away.

IE and her friends were still hanging out and drinking later that evening when Appellant returned. IE went to the restroom and Appellant followed her there, prompting IE to ask him to get out of the restroom. Appellant hesitated, then heard people coming and left. IE returned to watch the fireworks.

Later, Appellant returned again, and the two talked for about 15–20 minutes. He asked IE if she wanted to go to a quiet place. They agreed to go to the theater room inside the dorm building where they sat down and talked. Appellant used his hand to pull IE's face towards him. IE turned her head away and pushed him away from her. This happened two to three times. During this exchange, Appellant repeatedly placed his hand on her buttocks. Each time, IE pushed Appellant away and told him to stop or she was going to leave. Appellant apologized and said that he would stop. A few minutes later, Appellant tried to kiss IE. He then pulled down his pants and again put his hands on her buttocks. IE could see that Appellant had an erection. Appellant tried to put IE's hand in "that area." IE did not want "to do that," so she left. She heard Appellant say that IE "can't just leave him like that."

## II. DISCUSSION

### A. Challenge for Cause to SG

#### 1. Additional Background

For his forum selection, Appellant elected a panel consisting of officers and enlisted members. One of the detailed members was SG. During general voir dire, SG indicated that she might know one of the witnesses. She also indicated that a member of her family or someone close to her had been a victim of a similar offense to the one charged in this case. She indicated that she knew a friend, family member, neighbor, coworker, or member of her unit that had been accused or convicted of a similar offense to one charged in this case. She

responded affirmatively to a question asking if she had been told that a person cannot consent to sexual activity if they had consumed any amount of alcohol.

Following general voir dire, multiple members were recalled for individual voir dire, including SG. She was questioned further about her initial answers. She stated that her cousin had been raped while growing up and that her sister-in-law and wife had both been molested by their fathers while growing up. She also stated that she knew a former coworker who had been molested by a different coworker at one time.

Regarding the coworker, SG stated it had happened before SG's time but it came up in a conversation. She stated that she was told by her coworker that her assailant, a prior coworker, entered her shower and "molested" her. That was the extent of SG's knowledge of what happened.

With regards to her cousin, SG did not know by whom the cousin was raped. She knew that it was someone in the family, but it was kept "hush hush" by the family. SG did not interact often with her cousin describing it as "[m]aybe a text here and there, like, in a year kind of thing."

SG was also asked about her knowledge of the circumstances regarding her wife and sister-in-law being molested as children by their father. SG had next to no knowledge about her sister-in-law's situation. Regarding her wife, SG learned about the molestation while she and her-now-wife were dating. SG stated that this disclosure brought the two of them closer together. She had discussed this situation with her wife "when she brings it up." On those occasions, SG's wife becomes emotional. SG's response is to hold her and listen because she "can't really relate."

SG was asked about who told her that a person cannot consent to sexual activity if they had consumed any amount of alcohol. She stated that she heard that in a briefing from the sexual assault prevention and response training. The military judge asked her if she could follow his instructions and "put that out of [her] head." Without hesitation, SG indicated that she could.

When asked which witness she knew, SG stated that it was OC.[5] She stated that she knew him professionally only, would interact with him once per year, and that if he did testify, she would not give his testimony more weight than others simply because she knew him and interacted with him previously.

SG was also asked about the person she knew who was accused of committing a similar offense. She stated that it was a prior coworker who was accused of sexually assaulting another Airman. She stated that she had moved to

---

[5] OC was a commander's support staff superintendent. OC testified during the trial that KE told him that she had been assaulted and by whom.

another duty station when this happened but heard about it. Before she moved, she was close to the accused Airman, but did not remain in contact afterwards. She was not involved in the case at all.

The military judge noted SG's demeanor while being questioned and described it as reserved, noting that SG did not seem upset. Rather, he found her to be "sort of middle of the road the whole conversation to me."

### 2. Law

A military judge's determination that a member does not have actual bias is reviewed by this court for abuse of discretion. *United States v. Keago*, __ M.J. __, No. 23-0021, 2024 CAAF LEXIS 256, at *8 (C.A.A.F. 9 May 2024) (citing *United States v. Hennis*, 79 M.J. 370, 384 (C.A.A.F. 2020)).

When reviewing a military judge's determination on implied bias, we apply a standard of review "that is less deferential than abuse of discretion, but more deferential than de novo review." *Id.* (citing *United States v. Peters*, 74 M.J. 31, 33 (C.A.A.F. 2015)).

In *Keago*, our superior court explained,

> We interpret our case law as dictating a sliding standard of appellate review for implied bias challenges that falls somewhere on a spectrum between de novo and abuse of discretion based on the specific facts of the case. A military judge who cites the correct law and explains his implied bias reasoning on the record will receive greater deference (closer to the abuse of discretion standard), while a military judge who fails to do so will receive less deference (closer to the de novo standard). Accordingly, the more reasoning military judges provide, the more deference they will receive.

*Id.* at *11–12 (citing *United States v. Rogers*, 75 M.J. 270, 273 (C.A.A.F. 2016)).

"[I]n close cases [of implied bias,] military judges are enjoined to liberally grant challenges for cause" from the Defense. *Id.* at *12 (emphasis omitted) (quoting *United States v. Clay*, 64 M.J. 274, 277 (C.A.A.F. 2007)). In other words, "military judges retain their discretion to determine whether a challenge for cause constitutes a 'close case' of bias. However, when a case is close, the liberal grant mandate prohibits military judges from denying the challenge." *Id.* at *12–13 (footnote omitted).

### 3. Analysis

Reviewing the military judge's ruling on the Defense's challenge for cause to SG as well as the six other challenges for cause, the military judge meticulously articulated the applicable law regarding actual bias and implied bias.

Further, he repeatedly noted the applicability of the liberal grant mandate to defense challenges for cause, and specifically articulated his awareness that in close cases military judges were required to apply the liberal grant mandate to implied bias challenges. Moreover, he provided a detailed analysis on the record substantiating his ruling on the denial of the challenge for cause to SG. Under these circumstances, our standard of review moves significantly closer to abuse of discretion. *Cf. Rogers*, 75 M.J. at 273 ("As the military judge did not perform an implied bias analysis on the record, our review of her analysis will move toward a de novo standard of review.").

Appellant personally asserts that the military judge erred by denying the challenge for cause to SG. He argues that the military judge did not sufficiently consider or apply the liberal grant mandate and that he did not state whether this was a close call. We disagree.

SG's challenge for cause was the last in a line of seven defense challenges for cause. Review of the rulings on these reveals that the military judge fully understood the law and applied it correctly. In making his rulings, he repeatedly referenced the liberal grant mandate, and it is apparent that he considered it before ruling on the challenges.

It is arguable that SG's status as a spouse of a victim of a sexual offense alone raises the specter of implied bias. However, our superior court has made clear that such a status alone is not per se disqualifying. *See United States v. Terry*, 64 M.J. 295, 297 (C.A.A.F. 2007) ("[A] prior connection to a crime similar to the one being tried before the court-martial is not per se disqualifying to a member's service."). In fact, the court impliedly reiterated this holding very recently. In *Keago*, the United States Court of Appeals for the Armed Forces (CAAF) granted review to determine whether the military judge erred in denying challenges for cause against three prospective panel members. 2024 CAAF LEXIS 256, at *3. The CAAF found error in the military judge not excusing two members for cause. *Id.* at *18. The third member challenged was a spouse of a victim of sexual assault. *Id.* at *6–7. The CAAF did not articulate whether it found error in the military judge's denial of the challenge for cause to this member. *Id.* at *14 ("[S]everal factors lead us to conclude that the *two* challenged members presented a close case of implied bias." (emphasis added)).

Here, the military judge was satisfied based on SG's in-court testimony that she did not demonstrate actual bias or implied bias. As we apply a standard closer to abuse of discretion, we note that his findings of fact were not clearly erroneous, and his application of the law was not arbitrary, fanciful, clearly

unreasonable, or clearly erroneous.[6] *See United States v. White*, 69 M.J. 236, 239 (C.A.A.F. 2010) (citation omitted) (holding that the abuse of discretion standard is a strict one, calling for more than a mere difference of opinion). Based on our analysis, we find the military judge did not err by denying the defense challenge for cause to SG.

## B. Legal and Factual Sufficiency

Appellant challenges the legal and factual sufficiency of his sexual assault conviction involving KE.

### 1. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted). The test for legal sufficiency "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *United States v. Oliver*, 70 M.J. 64, 68 (C.A.A.F. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1973)).

"The test for factual sufficiency is 'whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses,' [this] court is 'convinced of the [appellant]'s guilt beyond a reasonable doubt.'" *United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000) (quoting *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987)). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying

---

[6] Notably, the military judge did grant a defense challenge for cause against another member who had asserted that his spouse had been sexually assaulted, illustrating the military judge's understanding of the applicable law as well as the careful consideration given to each member's individual responses and circumstances.

'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399). This court's review of the factual sufficiency of evidence for findings is limited to the evidence admitted at trial. *United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct. Crim. App. 2021) (citation omitted), *rev. denied*, 82 M.J. 312 (C.A.A.F. 2022); *United States v. Beatty*, 64 M.J. 456, 458 (C.A.A.F. 2007) (citations omitted).

Appellant was convicted of sexual assault without consent, in violation of Article 120, UCMJ, which required the Government to prove the following elements beyond a reasonable doubt: (1) that Appellant committed a sexual act upon KE by penetrating her vulva with his penis; and (2) that Appellant did so without KE's consent. *Manual for Courts-Martial, United States* (2019 ed.), pt. IV, ¶ 60.b.(2)(d).

### 2. Analysis

Appellant alleges that his conviction for sexual assault without consent is legally insufficient. He argues that the legally insufficiency is raised because the Government's theory of criminality was that Appellant committed sexual assault upon a person incapable of consenting due to impairment by an intoxicant rather than sexual assault without consent as was charged. The plain language of this sexual assault specification alleges that Appellant did "commit a sexual act upon [KE] by penetrating her vulva with his penis, without her consent." The military judge correctly instructed the members,

> To find the accused guilty of this offense, you must be convinced by legal and competent evidence beyond a reasonable doubt of the following elements. That on or about 8 June 2019, at or near Spangdahlem Air Base, Germany, the accused committed a sexual act upon [KE] by penetrating her vulva with his penis. And that the accused did so without the consent of [KE].

Without objection, he instructed the members consistent with the statutory definition of consent.[7] The evidence presented supports Appellant's conviction for sexual assault without KE's consent. Review of the record demonstrates that the military judge, all counsel, and the members were aware that the criminal theory at issue (in fact, the central issue) in this trial was whether Appellant committed the conduct without KE's consent. The evidence presented on the charged sexual assault offense, and the correct military judge's

---

[7] To the extent that this issue raises an objection to the findings instructions with regards to the elements of this specification, we find that issue waived. *United States v. Davis*, 79 M.J. 329, 331–32 (C.A.A.F. 2020).

instructions, eviscerate any concern that Appellant was convicted of a theory of criminal liability not squarely and appropriately before the members.

Appellant also argues that his conviction for sexual assault is factually insufficient. He points to his reaction when KE pretended to be asleep while he was penetrating her vulva with his penis. His reaction of saying, "Oh, no," when he saw KE with her eyes closed, and shaking her shoulder to get her to wake up or open her eyes is some evidence that Appellant may have had an honest, genuine mistake of fact as to consent. However, review of the evidence presented in this case convinces us that if Appellant did have a mistake of fact as to consent, such a belief would be unreasonable under the circumstances. KE repeatedly rebuffed Appellant's physical advances from the first time they met each other in person. Furthermore, KE rebuffed Appellant when he asked, "So my room or yours?" KE responded, "You go to yours and I'll go to mine." The evidence proved that KE did not consent to sex with Appellant and disproved that Appellant had a reasonable mistake of fact as to consent. KE testified that she awoke in Appellant's room with Appellant having sex with her. KE opened her eyes and saw Appellant's penis inside of her. Her subsequent actions, including running away from Appellant's room, immediately and emotionally relaying to her friends what had happened, as well as the results of the forensic testing substantially corroborate her testimony.

After viewing the evidence in the light most favorable to the Prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Moreover, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are convinced of the Appellant's guilt beyond a reasonable doubt.

## C. Trial Counsel Findings Argument

Appellant alleges that trial counsel made several improper arguments and as a result, requests the court to set aside and dismiss the sexual assault conviction and set aside the segmented sentence to 30 months confinement and the dishonorable discharge.

### 1. Additional Background

Appellant's brief addresses the following portions of trial counsel's findings argument alleged to be improper.[8] We have italicized the specific language emphasized by Appellant in his brief as improper:

> . . . *Because the thing is the law as the military judge has instructed you tells you he is guilty.*

---

[8] Argument portions in the first three paragraphs are the matters personally raised by Appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

. . . .

Now let's talk about [KE]. She didn't get emotional on the witness stand. *When we talked way back at the very beginning of this process, do you remember the very beginning of this process? We – the attorneys had a lot of questions for you, and we talked about a lot of things during that process. And we talked to you about how people process events differently. And it's no different for victims of sexual assault.* And so yeah, she didn't get emotional on the witness stand.

. . . .

They showed you a picture that she posted that night. Again, remember, she's a 19-year-old kid. She's away from home. Her life, her family, it's all social media. So she posted a picture about herself where she thought she looked good. *So much has been taken from her because of him. Don't let them take her self-esteem as well.*

. . . .

And here's the other thing he knows. He knew she was drinking. *And he knew she was getting to the point where she's getting – where she's blacking out.*

. . . .

It's forcing facts to fit a narrative that's just not so. That wasn't – they asked the question, "Wasn't it true you could have consented," because it ignores everything else that happened, and again, it exploits a gap in her memory that she has to fill in by saying, *"I mean, I can't say what happened because I was blackout drunk." That doesn't mean she consented. She wasn't competent to consent, and the circumstances tell you she couldn't have consented.*

Trial defense counsel did not object to any portion of the trial counsel's arguments, including any of the above referenced arguments.

#### 2. Law

"Prosecutorial misconduct can be generally defined as action or inaction by a prosecutor in violation of some legal norm or standard, *e.g.*, a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon." *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996) (citations omitted). The Government's interest "in a criminal prosecution is not that it shall win a case,

but that justice shall be done." *United States v. Fletcher*, 62 M.J. 175, 179 (C.A.A.F. 2005) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)).

We review prosecutorial misconduct and improper argument de novo. *United States v. Voorhees*, 79 M.J. 5, 9 (C.A.A.F. 2019). When no objection is made at trial, we review for plain error. *United States v. Andrews*, 77 M.J. 393, 398 (C.A.A.F. 2018) (footnote and citations omitted). "Plain error occurs when (1) there is error, (2) the error is plain or obvious, and (3) the error results in material prejudice to a substantial right of the accused." *Id.* at 401 (quoting *Fletcher*, 62 M.J. at 179). We do not review counsel's words in isolation; we review the argument in context of the entire court-martial. *United States v. Baer*, 53 M.J. 235, 238 (C.A.A.F. 2000) (citations omitted).

Appellate judges must exercise care in determining whether a trial counsel's statement is improper or has improper connotations. The Supreme Court of the United States has emphasized that "a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974). A statement that might appear improper if viewed in isolation may not be improper when viewed in context. *See id.* at 645.

If we find a prosecutor's argument "amounted to clear, obvious error," we then determine "whether there was a reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Voorhees*, 79 M.J. at 9 (citations and internal quotations marks omitted). "For constitutional errors, rather than the probability that the outcome would have been different, courts must be confident that there was *no reasonable probability* that the error *might have contributed* to the conviction." *United States v. Tovarchavez*, 78 M.J. 458, 462 n. 5 (C.A.A.F. 2019) (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)). That is, "where a forfeited constitutional error was clear or obvious, 'material prejudice' is assessed using the 'harmless beyond a reasonable doubt' standard set out in *Chapman*." *Id.* at 460 (quoting *United States v. Jones*, 78 M.J. 37, 45 (C.A.A.F. 2018)). In analyzing prejudice from a prosecutor's improper argument, we consider: "(1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the weight of the evidence supporting the conviction." *Andrews*, 77 M.J. at 402 (quoting *Fletcher*, 62 M.J. at 184).

Absent evidence to the contrary, we may "presume that members follow a military judge's instructions." *United States v. Taylor*, 53 M.J. 195, 198 (C.A.A.F. 2000) (citations omitted).

In a plain error analysis, the most straightforward way of resolving an allegation of prosecutorial misconduct may be to do so based on prejudice. *United States v. Palacios Cueto,* 82 M.J. 323, 335 (C.A.A.F. 2022).

**3. Analysis**

As a preliminary matter, we note that of the portions of the argument alleged to be improper, none implicate Appellant's constitutional rights. Thus, we apply a plain error analysis of a nonconstitutional error to resolve this issue.

Three of five alleged improper argument portions do not strike us as problematic when looked at in the context of the entire trial. *Donnelly*, 416 U.S. at 645. Trial counsel arguing, "the law as the military judge has instructed you tells you he is guilty" is not clear or obvious error. This is particularly true in light of the military judge's instruction, "You are simply required to be fair to both sides, determine the facts based on the evidence provided, apply the law that I provide to those facts, and not be influenced by outside factors." The obvious implication of trial counsel's argument is that an application of the law to the facts and evidence presented "tells you he is guilty." Appellant argues that this statement puts "the military judge's imprimatur on their argument, implying that the military judge believes he's guilty, and so should they." However, the military judge instructed the members,

> You must disregard any comment or statement or expression made by me during the course of the trial that might seem to indicate any opinion on my part as to whether the accused is guilty or not since you alone have the responsibility to make that determination.

We may "presume that members follow a military judge's instructions." *Taylor*, 53 M.J. at 198. Considering this portion of the argument in the context of the entire case as well as the military judge's instructions, it did not amount to clear and obvious error.

Appellant next points to trial counsel's argument that referenced KE's testimony, "I can't say what happened because I was blackout drunk" and arguing, "That doesn't mean she consented. She wasn't competent to consent, and the circumstances tell you she couldn't have consented." This argument is not error, plain or otherwise. The military judge instructed the members,

> "Consent" means a freely given agreement to the conduct at issue by a competent person. An expression of lack of consent through words or conduct means there is no consent. Lack of verbal or physical resistance does not constitute consent. Submission resulting from the use of force, threat of force, or placing another person in fear also does not constitute consent. A

current or previous dating or social or sexual relationship by itself, or the manner of dress of the person involved with the accused in the conduct at issue does not constitute consent. *A sleeping, unconscious, or incompetent person cannot consent. All of the surrounding circumstances are to be considered in determining whether a person gave consent.*

(Emphasis added). Trial counsel arguing that a person's physical condition rendered her incompetent to consent and that "the circumstances tell you she couldn't consent" are fair arguments in light of the evidence presented and the military judge's instructions. A forensic psychologist testified in detail regarding alcohol-induced blackouts and pass-outs. KE described drinking alcohol that evening to the point she felt "drunk or buzzed." She stated after drinking the alcohol and accepting a piggyback ride, she "woke up" with Appellant's penis inside her. As a matter of law, a sleeping person is incompetent to consent to sexual activity—so KE "waking up" to Appellant having sex with her necessarily means Appellant initiated that sex act with her while she was "incapable of consenting." Considering this portion of the argument in the context of the entirety of the argument as well as the entirety of the trial, including the military judge's instructions, the argument was not clear and obvious error.

With regards to trial counsel's argument that Appellant knew that KE had been drinking and that Appellant knew she was getting to the point where she was blacking out, relevant evidence was presented. KE testified that she was out with Appellant at the concert and that she was drinking. She described watching the band and enjoying the music with a drink in her hand. After the show, they got in line together to meet the band and she had a drink in her hand. KE noted that during the evening, Appellant was looking at her and smiling and that it made her feel uncomfortable. Towards the end of the evening, with KE feeling drunk and tired, Appellant offered to give her a piggyback ride. This evidence demonstrated that Appellant had a full opportunity to see KE, have knowledge that she was drinking and to see her reaction to that. Bearing in mind this evidence, trial counsel's argument is arguably a fair inference based on the surrounding circumstances. In any case, this portion of the argument was not plain or obvious error.

Two of the five arguments referenced by Appellant in his brief were error. Trial counsel's argument, albeit briefly, referencing questions asked in voir dire was error. Specifically, trial counsel said, "the attorneys had a lot of questions for you, and we talked about a lot of things during that process. And we talked to you about how people process events differently. And it's no different for victims of sexual assault." Questions and answers in a voir dire session are not evidence for members to consider while making a determination of the findings. R.C.M. 919(b). However, trial counsel's statement here seems merely to

articulate the unremarkable truth that people process events of their lives in different ways. In this context, even if we assume the error was plain or obvious, this brief reference to the voir dire session in trial counsel's argument was not prejudicial. Notably, the military judge instructed the members after counsel completed their arguments,

> Your job is to determine whether based on the evidence actually presented, the government has proven its case beyond a reasonable doubt. Of course, absence of evidence could create a reasonable doubt, but you must not speculate about evidence or witnesses not presented to you. Confine your deliberations to considerations of the quality and quantity of evidence actually presented at trial and reasonable inferences to be drawn therefrom.

This instruction provided an adequate clarification and corrective measure to alleviate any possible prejudice from the error.

Trial counsel arguing "[s]o much has been taken from her because of him. Don't let them take her self-esteem as well" was also improper. Trial counsel's argument here concerns a photo posted on social media as KE's profile picture. The picture was posted, as trial defense counsel asked, on "the same night that you recall last being on his back ['piggyback'] before finding yourself in his room." This photo was raised in trial defense counsel's argument to support his position that KE's allegation was not credible. Trial counsel responded to the cross-examination and trial defense counsel's argument arguing that trial defense counsel and Appellant were trying to "take her self-esteem." This response was too far in the context of the arguments and the trial. However, the error did not result in material prejudice to a substantial right of Appellant. *Andrews*, 77 M.J. at 401. Considering the fleeting nature of the comment and the strength of the evidence supporting the conviction, as noted above, this argument did not result in prejudice despite the fact that no corrective measures were taken. *See id.*

## D. Post-Trial Delay

### 1. Additional Background

Appellant was sentenced on 9 February 2022. The entry of judgment for this case was signed on 4 March 2022.

According to the court reporter's chronology in the record of trial, the 1,190-page transcript was completed on 15 August 2022. The transcription was certified by the court reporter, EK, on 10 September 2022, just over seven months from the date Appellant was sentenced.

On 22 October 2022, the Spangdahlem AB legal office received the transcription from the court reporter. On 1 November 2022, the legal office began

compiling the record of trial for this case and another case they were processing simultaneously. On 28 November 2022, the record of trial for this case and the other case were sent to the Military Justice and Policy Division (JAJM) at Joint Base Andrews, Maryland, for processing then forwarding to this court for docketing. Shipment tracking indicates that the records were picked up at the Joint Base Andrews postal facility on 12 December 2022. In early January 2023, a paralegal from the Spangdahlem AB legal office spoke with a paralegal at their supervisory numbered air force legal office and was told that the numbered air force had not heard about the status of the records of trial, but that they would follow up with JAJM soon.

In late February 2023, the Spangdahlem AB legal office received feedback regarding their compilation of the record of trial in the case that was simultaneously processed with the record of trial for Appellant's case. However, they did not receive feedback on the record of trial for Appellant's case. When asked, JAJM indicated that they would search for the record of trial for Appellant's case. On 6 March 2023, JAJM notified the supervisory numbered air force legal office that they could not locate the record of trial for Appellant's case and that it needed to be resent.

On 10 March 2023, the Spangdahlem AB legal office resent the record of trial for Appellant's case to JAJM. The case was docketed with this court on 28 March 2023, 412 days from the date Appellant was sentenced.

**2. Law**

We review the question of whether an appellant's due process[9] rights are violated because of post-trial delay de novo. *United States v. Livak*, 80 M.J. 631, 633 (A.F. Ct. Crim. App. 2020) (citation omitted).

"[C]onvicted servicemembers have a due process right to timely review and appeal of [their] courts-martial convictions." *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006) (citations omitted).

In *Livak,* this court established an aggregated sentence-to-docketing 150-day threshold for facially unreasonable delay in cases, like Appellant's, which were referred to trial on or after 1 January 2019. *Livak,* 80 M.J. at 633. A presumption of unreasonable delay also arises when appellate review is not completed and a decision is not rendered within 18 months of the case being docketed. *Moreno*, 63 M.J. at 142.

If there is a presumptive or an otherwise facially unreasonable delay, we examine the matter under the four non-exclusive factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for

---

[9] U.S. CONST. amend. V.

the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Moreno*, 63 M.J. at 135 (citing *Barker*, 407 U.S. at 530). *Moreno* identified three types of prejudice arising from post-trial processing delay: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of a convicted person's grounds for appeal and ability to present a defense at a rehearing. *Moreno*, 63 M.J. at 138–39 (citations omitted). "We analyze each factor and make a determination as to whether that factor favors the Government or appellant." *Id.* at 136 (citation omitted). Then, we balance our analysis of the factors to determine whether a due process violation occurred. *Id.* (citing *Barker*, 407 U.S. at 533).

"No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* (citing *Barker*, 407 U.S. at 533). However, where an appellant has not shown prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

Even in the absence of a due process violation resulting from excessive post-trial delay, "a Court of Criminal Appeals has authority under Article 66[, UCMJ, 10 U.S.C. § 866,] to grant relief for excessive post-trial delay without a showing of 'actual prejudice' within the meaning of Article 59(a), [UCMJ, 10 U.S.C. § 859(a),] if it deems relief appropriate under the circumstances." *United States v. Tardif*, 57 M.J. 219, 224 (C.A.A.F. 2002) (citation omitted). The essential inquiry under *Tardif* is whether, given the post-trial delay, the sentence "remains appropriate[ ] in light of all circumstances." *Toohey*, 63 M.J. at 362 (citing *United States v. Bodkins,* 60 M.J. 322, 324 (C.A.A.F. 2004) (per curiam)).

We provided a further analytical framework for that analysis in *United States v. Gay*, where we set forth six factors to consider before granting "sentence appropriateness" relief under *Tardif*, even in the absence of a due process violation:

> 1. How long did the delay exceed the standards set forth in [*Moreno*]?
>
> 2. What reasons, if any, has the [G]overnment set forth for the delay? Is there any evidence of bad faith or gross indifference to the overall post-trial processing of this case?
>
> 3. Keeping in mind that our goal under *Tardif* is not to analyze for prejudice, is there nonetheless some evidence of harm (either to the appellant or institutionally) caused by the delay?

4. Has the delay lessened the disciplinary effect of any particular aspect of the sentence, and is relief consistent with the dual goals of justice and good order and discipline?

5. Is there any evidence of institutional neglect concerning timely post-trial processing, either across the service or at a particular installation?

6. Given the passage of time, can this court provide meaningful relief in this particular situation?

74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016). In our consideration of the above factors, "no single factor [is] dispositive, and a given case may reveal other appropriate considerations for this court in deciding whether post-trial delay has rendered an appellant's sentence inappropriate." *Id.* (footnote omitted).

### 3. Analysis

Appellant's case was not docketed with the court until 412 days after he was sentenced. Appellant characterizes this delay as "unreasonable" and "egregious." As a result, he urges this court to dismiss the charges against him or, in the alternative, be granted "significant post-trial confinement credit." Application of the law to the facts of this case does not support dismissal of the charges. However, it does support the granting of some relief.

The aggregated sentence-to-docketing timeline of 412 days is well over the established 150-day threshold and is facially unreasonable. The length of the delay—more than twice and nearly three times the standard—weighs in favor of Appellant.

Justifiable reasons for the delay are not apparent from the record. There seems to have been a problem in the receipt and processing of the record of trial once it arrived from Germany. This problem necessitated a compilation of a new copy of the record of trial and forwarding to JAJM. Those types of problems are to be expected on occasion, especially when shipments occur from overseas locations. However, a lost record of trial does not explain the inordinate amount of time it took to complete the transcription in this case. While the transcription for this case is not minimal at 1,169 pages, it is not oppressively long. Seven months to complete the transcription is simply too long to be reasonable absent any attending extraordinary circumstances.

Furthermore, the shipment issues do not explain the general lack of urgency demonstrated in processing of the record even after the transcription was completed. For example, it is unclear why it took 42 days to get the completed transcription to the servicing legal office. It is unclear why it took 36

more days to ship the record of trial out of the servicing legal office.[10] And it is unclear why, after discovering that there may be a problem with the shipment, it took nearly three months to get a new record docketed. These issues combined with lack of adequate explanation weigh in favor of Appellant. In the absence of any explanations for these delays, we are inclined to infer our own: that the lack of urgency is emblematic of a "gross indifference" to overall posttrial processing in this case. *See Gay*, 74 M.J. at 744.

Regarding any demand for speedy post-trial review, it appears that appellate defense counsel sought information from the servicing legal office regarding the record of trial and docketing of the case with this court on 10 October 2022, 14 October 2022, and 7 March 2023. While Appellant did not demand a speedy post-trial review, he was clearly expressing interest in the forward movement of the case. Under the unique circumstances of this case, this factor weighs only slightly in favor of the Government.

Turning to prejudice, Appellant does not prove or even allege any of the prejudice articulated in *Moreno*. We find no evidence of oppressive incarceration; anxiety and concern; or impairment of Appellant's grounds for appeal and ability to present a defense at a rehearing. This factor weighs heavily against Appellant.

Having evaluated the *Barker* factors, we do not find a due process violation. In the absence of prejudice under *Moreno*, we find that while this delay does not reflect well overall on the military justice system, it was not so egregious as to "adversely affect the public's perception of the *fairness and integrity* of the military justice system." *Toohey*, 63 M.J. at 362 (emphasis added). However, this determination does not end our inquiry.

Even in the absence of a due process violation resulting from excessive post-trial delay, we may grant relief for excessive post-trial delay without a showing of actual prejudice within the meaning of Article 59(a), UCMJ, if we deem relief is appropriate under the circumstances. *Tardif*, 57 M.J. at 224 (citation omitted). We make that determination by considering the factors set forth in *Gay*, 74 M.J. at 744.

---

[10] Although the record is unclear on this point, the delay in completion seems to indicate that the servicing legal office did not begin to compile the record of trial until the transcription was received. It would be disappointing if this is accurate. Waiting eight months for a transcription and not utilizing any of that lead time to begin putting together a record of trial is not the best practice. A more reasonable effort would be demonstrated by a timeline which could suggest that the record of trial was poised and ready to insert the transcription when received, so that it could be moved along with the urgency reflecting the seriousness which court-martial processing should warrant.

The first three of the factors set forth are discussed *supra*. There is no evidence that the sentence-to-docketing delay lessened the disciplinary effect of any particular aspect of the sentence. The provision of relief would still be consistent with the dual goals of justice and good order and discipline. Passage of time would not prohibit the court from providing meaningful relief.

With regards to evidence of institutional neglect concerning timely post-trial processing, either across the service or at a particular installation, this court addressed this consideration at length recently in *United States v. Valentin-Andino*, No. ACM 40185 (f rev), 2024 CCA LEXIS 223, at *17–19 (A.F. Ct. Crim. App. 7 Jun. 2024) (unpub. op.). The court found "a systemic problem indicating institutional neglect" with regards to "errors in records of trial causing delays in appellate review." *Id*. at *17. However, the court in *Valentin-Andino* did not find institutional neglect with regards to transcription completion delays, and we find that there have been no new developments since the *Valentin-Andino* decision to suggest that transcription completion delays have become an institutional problem. We find that the processing of this record of trial, from completion of the transcription to processing delays in completing and preparing the record for shipment, as well as resolving the issues arising after shipment presented problems, demonstrate indifference and neglect with regards to this particular case. However, based on this one case alone, we will not find institutional neglect.

The unreasonable length of delay in transcribing and forwarding the case for docketing certainly does approach a level of "gross indifference" by the Government that we identified as an important factor in *Gay* for potentially fashioning relief for excessive post-trial delay (even absent actual prejudice to Appellant). Accordingly, considering all the facts and circumstances reflected in this record of trial and the processing of it, we find that relief is warranted. *See Tardif*, 57 M.J. at 225; *Gay*, 74 M.J. at 744. In the absence of actual prejudice to Appellant, we also deem it appropriate to carefully calibrate our relief to avoid "windfall" relief disproportionate to the excessive post-trial delay involved in this case. Accordingly, we do not affirm the adjudged reprimand and only affirm a confinement term of 33 months.

## III. CONCLUSION

The findings as entered are correct in law and fact and no error materially prejudicial to the substantial rights of Appellant occurred. We affirm only so much of the sentence that includes a dishonorable discharge, confinement for 33 months, and reduction to the grade of E-1. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d).

Accordingly, the findings and sentence, as modified, are **AFFIRMED**.



FOR THE COURT

CAROL K. JOYCE
Clerk of the Court